UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARVIN BEDNARSH,

          Petitioner,                        Hon. Janet T. Neff

v.                                     Case No. 1:10-CV-303

MARY BERGHUIS,

          Respondent.

_____/


## REPORT AND RECOMMENDATION

      This matter is before the Court on Bednarsh's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Bednarsh's petition be **denied**.


## BACKGROUND

      As a result of events that allegedly occurred on March 17, 2006, Petitioner was charged with three counts of Second Degree Criminal Sexual Conduct.  (Trial Transcript, June 13, 2007, 17-20).  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

1

**Charlene Long**

As of March 2006, Long resided in Southfield.  (Trial Transcript, June 15, 2007, 13).

Because her boyfriend lived in Muskegon, Long spent "half of the week" in Muskegon and the other

half in Southfield.  (Tr. 18).  On March 30, 2006, Petitioner was walking his dog past Long's house

when he called out to Long's nine-year-old daughter, J.W.  (Tr. 13-16).  When Long heard this, she

"stepped outside. . .and introduced [herself]" to Petitioner.  (Tr. 16).

Petitioner told Long that "he knew [J.W.] from the neighborhood."  (Tr. 17).  Long

subsequently learned that Petitioner lived "roughly five houses" down from her residence.  (Tr. 29).

Petitioner stated that "he used to own a video store and he'd given [J.W.] some videos."  (Tr. 17).

Petitioner indicated that "he was surprised that [J.W.] was home that day, because. . .normally, we

weren't there."  (Tr. 18).  Petitioner then told Long that "he had an original copy of the Jungle Book

and that, probably for [J.W.'s] birthday in July. . .that he would probably give her that as a gift."  (Tr.

17-18).  Long was "shocked" that Petitioner knew the date of J.W.'s birthday.  (Tr. 18).

In the early morning hours of April 3, 2006, Long heard J.W. crying in her sleep.  (Tr.

20).  When Long entered her daughter's room, she heard J.W. say, "don't do that, I don't like that

stop, don't touch me like that, please don't do this."  (Tr. 20-21).  Long then searched the State of

Michigan sex offender registry and discovered that Petitioner was a registered sex offender.  (Tr. 24-

25).  Long then showed J.W. a picture of Petitioner and asked her if Petitioner "ever hurt [her] in any

way."  (Tr. 29-30).  J.W. responded that Petitioner had sexually assaulted her.  (Tr. 21-30).

**J.W.**

Petitioner lived "right across from" J.W.'s bus stop.  (Trial Transcript, June 15, 2007, 36-38).  Every day when J.W. exited the bus, Petitioner was standing in his yard with dogs.  (Tr. 36-38).  J.W. would walk over to Petitioner's house and pet the dogs and talk with Petitioner.  (Tr. 38-39).  On one particular day, J.W. asked Petitioner if she could pet one of Petitioner's dogs.  (Tr. 39-40).  Petitioner responded that J.W. would have to "go in the house" if she wanted to pet the dog.  (Tr. 39-40).  J.W. agreed and entered Petitioner's residence.  (Tr. 40).  Once inside, Petitioner led J.W. into the basement where he let J.W. "pick out some movies."  (Tr. 40-41).  As J.W. was looking through Petitioner's movie collection, Petitioner approached J.W. from behind and began "to rub" her chest, stomach, and thighs.  (Tr. 41-45).  Despite J.W.'s repeated requests to "stop," Petitioner continued rubbing J.W. in this fashion several times.  (Tr. 45).

**Autumn Kennedy**

As of April 3, 2006, Kennedy was employed as a police officer for the City of Southfield.  (Trial Transcript, June 15, 2007, 59).  On this date, Officer Kennedy was dispatched to Charlene Long's residence to investigate a report of sexual assault.  (Tr. 59-61).  When Kennedy spoke with J.W. she was "very careful to ask her only nonleading questions" which required J.W. to report in her own words what occurred.  (Tr. 61).  Kennedy related that in her experience if "somebody's been coached, they will look at their coach after each answer to see, did I do it right, especially kids."  (Tr. 63).  When she was questioned by Kennedy, J.W. did not look at her mother for support or confirmation, but instead appeared to be answering "out of her [own] thought process."  (Tr. 63).  Kennedy concluded that J.W. "did not appear coached."  (Tr. 63).

**Lawrence Porter**

As of April 3, 2006, Porter was employed as a police officer for the City of Southfield. (Trial Transcript, June 15, 2007, 69). On this date, Officer Porter was dispatched to Charlene Long's residence to investigate a report of sexual assault. (Tr. 69-70). Believing that J.W. would be more comfortable speaking with a female, Officer Porter requested that Officer Kennedy speak with J.W. (Tr. 70-71). After speaking with J.W., Officer Kennedy relayed to Officer Porter what J.W. alleged. (Tr. 71). Officer Porter then walked to Petitioner's residence. (Tr. 71). Porter spoke with Petitioner who acknowledged knowing J.W. and giving her movies. (Tr. 71-73). An examination of Petitioner's basement revealed that "the setup of the basement" was consistent with what J.W. described. (Tr. 74-75).

**Blake Matatall**

As of April 3, 2006, Matatall was employed as a police officer for the City of Southfield. (Trial Transcript, June 15, 2007, 81-82). On this date, Officer Matatall was dispatched to Charlene Long's residence to investigate a report of sexual assault. (Tr. 82). Officer Matatall subsequently traveled to Petitioner's residence where an examination of the basement revealed a "wall of movies" and a "bunch of dollhouses, as well as little kids' toys." (Tr. 84-85). Officer Matatall also observed a bedpost to which a pair of handcuffs was attached. (Tr. 85).

**S.B.**

Petitioner is S.B.'s uncle. (Trial Transcript, June 15, 2007, 92-93). When S.B. was nine years old, she was sexually assaulted by Petitioner. (Tr. 92). Specifically, Petitioner

approached S.B. from behind and began rubbing her chest and "private parts."  (Tr. 94-95).

**Dave Clevenger**

As of April 3, 2006, Clevenger was employed as a detective for the City of Southfield. (Trial Transcript, June 15, 2007, 98).  Detective Clevenger interviewed Petitioner on the morning of April 3, 2006, following his arrest.  (Tr. 98-99).  Before speaking with Petitioner, Detective Clevenger informed Petitioner of his *Miranda* rights.  (Tr. 99).  Specifically, Clevenger provided Petitioner with a printed form detailing the rights in question.  (Tr. 99).  Clevenger read aloud to Petitioner his *Miranda* rights.  (Tr. 99).  Petitioner then "read [the *Miranda* rights] form, initialed the form, waived his rights, signed his name to the form, agreeing to speak with [the detective] in reference to the allegations."  (Tr. 99-100).  Prior to beginning his interview, Detective Clevenger asked Petitioner if he wanted anything to eat or drink.  (Tr. 101).  Petitioner requested water which was provided.  (Tr. 101).  Clevenger assessed Petitioner's physical condition and discerned nothing to suggest that Petitioner required medical attention.  (Tr. 101).

When questioned about J.W.'s allegations, Petitioner indicated that he had invited J.W. into his house on two occasions one of which was March 17, 2006.  (Tr. 102).  Petitioner acknowledged taking J.W. into his basement on this particular date and giving her some videos.  (Tr. 102).  Petitioner also reported that he helped J.W. step up onto a chair so that she could look through his video selection, but he denied the allegations that he sexually assaulted J.W.  (Tr. 102).  Petitioner conceded that "because of his past conviction for criminal sexual conduct in the second degree, he used bad judgment in having [J.W.] in the house."  (Tr. 104).  Petitioner also offered that "he needs help with his issues that he has of wanting to be around kids and that he is regularly. .

5

.seeing a therapist for assistance."  (Tr. 104).

## Wendy Bednarsh

Wendy is Petitioner's adult daughter.  (Trial Transcript, June 15, 2007, 128).  Wendy moved out of her parents' house in 2004.  (Tr. 130-31).  While Wendy no longer lived with her parents, she left behind many belongings including the dolls and toys located in the basement of Petitioner's house.  (Tr. 128-29).  Wendy further reported that the bedpost and handcuffs located in Petitioner's basement belonged to her.  (Tr. 130).

## Sana Tiwaini

As of March 17, 2006, Petitioner was employed by Tiwaini.  (Trial Transcript, June 15, 2007, 134-35).  On this particular date, Petitioner was scheduled to work from 10:00 a.m. until 6:00 p.m.  (Tr. 136).  However, Petitioner was away from work for approximately 45 minutes that afternoon to perform an errand for Tiwaini.  (Tr. 135).

## Paul Bednarsh

Paul is Petitioner's adult son.  (Trial Transcript, June 15, 2007, 144-45).  Paul was living with his parents as of March 17, 2006.  (Tr. 145).  Paul reported that "nothing out of the ordinary" occurred at the home that day.  (Tr. 146).  Paul acknowledged on cross-examination, however, that he was working that day and was not at home.  (Tr. 146-48).

Following the presentation of evidence, the jury found Petitioner guilty of all three charges.  (Tr. 175).  Petitioner subsequently pleaded guilty to be an habitual felon.  (Tr. 179-84).

Petitioner was sentenced to serve 11-30 years in prison.  (Sentence Transcript, July 31, 2006, 18).

Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I.  Constitutional due process and the Fifth Amendment right against self-incrimination are violated where an involuntary statement is obtained through police coercion and sleep deprivation.  Defendant contends that his statement to police, and waiver of *Miranda* rights, was involuntary.  Because the statement was used at trial, Defendant's said rights and privileges were violated.

> II.  The trial court violated Mr. Bednarsh's due process right to present a defense by excluding evidence he would have presented.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Bednarsh*, No. 286537, Order (Mich. Ct. App., Nov. 10, 2008).  Asserting the same two claims, as well as the additional claim that his right to the effective assistance of counsel had been violated by virtue of his trial attorney's performance, Petitioner later moved in the Michigan Supreme Court for leave to appeal.  The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court."  *People v. Bednarsh,* No. 138003, Order (Mich., April 28, 2009).  On March 30, 2010, Petitioner initiated the present action in which he asserts the following issues:

> I.  Involuntary statement obtained through police coercion.

> II.  Trial court denied Petitioner right to present a defense.

## STANDARD OF REVIEW

Bednarsh's petition is subject to the provisions of the Antiterrorism and Effective

Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the

substantive standards for granting habeas relief under the following provisions:

> (d)   An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim —
>
> > (1)   resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established
> > Federal law, as determined by the Supreme Court of
> > the United States, or
> >
> > (2)   resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the
> > evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law" or "if the state court confronts facts that are materially indistinguishable from a

relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301,

307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause

of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists."   *Gordon v. Kelly*, 2000 WL 145144 at *4

(6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Ayers*, 623 F.3d at 307.  Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary."  *Ayers*, 623 F.3d at 308.  Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds

unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state

courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.          **Voluntariness of Petitioner's Statements to the Police**

Petitioner asserts that the statements he made to Detective Clevenger following his arrest were coerced and involuntary. Petitioner asserts that the admission at trial of the statements in question violated his right to a fair trial.

After a jury was selected, but before any evidence was presented, the trial court held a hearing on Petitioner's motion to suppress the statements he made to Detective Clevenger following his arrest. (Trial Transcript, June 13, 2006, 73-104). Detective Clevenger was the first witness to testify at this hearing.

Clevenger indicated that Petitioner had been arrested and transported to the Southfield Police Department at approximately 4:00 a.m. on the morning of April 3, 2006. (Tr. 74-75). Clevenger indicated that he met with Petitioner at approximately 8:30 a.m. that morning. (Tr. 75). At the outset, Detective Clevenger informed Petitioner of his *Miranda* rights. (Tr. 76). Petitioner did not appear to experience any difficulty understanding Clevenger as he read aloud his *Miranda* rights. (Tr. 76-78). Detective Clevenger also provided Petitioner with a written *Miranda* rights form which detailed the rights in question. (Tr. 76-78). Petitioner read this form without difficulty after which he signed the form and agreed to speak with Detective Clevenger. (Tr. 76-82). Prior to beginning the interview, Detective Clevenger asked Petitioner if he wanted any food or water. (Tr.

11

79).  Petitioner requested water which was provided.  (Tr. 79).  Petitioner did not appear to be drugged, intoxicated, ill or in need of medical attention.  (Tr. 81).  Detective Clevenger did not make any threats or promises to Petitioner.  (Tr. 81-82).  Clevenger's interview of Petitioner lasted approximately 55-60 minutes.  (Tr. 82).

Petitioner testified at the suppression hearing as well. (Tr. 85-96).  Petitioner testified that he was arrested at approximately 4:00 a.m. on the morning of April 3, 2006, immediately after which he was transported to the police station.  (Tr. 85-87).  After arriving at the police station, Petitioner was booked and then placed into a cell by himself.  (Tr. 87).  Petitioner reported that he was not provided with any food and, moreover, that Detective Clevenger never offered him any food. (Tr. 87).  Petitioner acknowledged, however, that he never requested any food.  (Tr. 87).

Petitioner testified that when he met with Detective Clevenger he was "scared, terrified and confused."  (Tr. 88).  Petitioner was then given "a piece of paper" to read.  (Tr. 89). When Petitioner informed the detective that he was unable to read the paper without his eyeglasses, Clevenger read the form to Petitioner "kind of fast" and then asked Petitioner to sign it.  (Tr. 89). Petitioner initialed and signed the *Miranda* rights form.  (Tr. 93).

According to Petitioner, he then requested a lawyer, to which Detective Clevenger responded, "I'll tell you when you need a lawyer."  (Tr. 90).  Clevenger also told Petitioner, "I can be nice. So don't fuck with me."  (Tr. 90).  The detective then "kicked a chair against a wall."  (Tr. 91).  When Petitioner again requested an attorney, Clevenger responded, "you know I can break your arm."  (Tr. 91).  Petitioner reiterated his request for an attorney, to which Detective Clevenger responded, "we're not leaving this room until I get some answers."  (Tr. 91).  At this point, Petitioner agreed to answer the detective's questions.  (Tr. 92).

As has been long recognized, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination." *Thompkins v. Berghuis*, 547 F.3d 572, 582 (6th Cir. 2008) (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)).  Courts "must presume that a defendant did *not* waive his rights" and the prosecutor's burden to demonstrate otherwise "is great." *Thompkins*, 547 F.3d at 582 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  When assessing whether a defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent, courts must examine the totality of circumstances.  *See Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (quoting *Brown v. Illinois*, 422 U.S. 590 (1975)).  The circumstances relevant to this inquiry include: (1) the existence of police coercion; (2) the location, length, and continuity of the interrogation; (3) the defendant's maturity and education; (4) the defendant's physical condition and mental health; and (5) whether the defendant was advised of his *Miranda* rights.  *See Abela*, 380 F.3d at 928.

The trial judge rejected Petitioner's version of events, finding that Petitioner's decision to waive his *Miranda* rights and speak with Detective Clevenger was made "freely and voluntarily."  Accordingly, Petitioner's motion to suppress was denied. (Tr. 102-04).  The Michigan Court of Appeals subsequently denied Petitioner's appeal on this issue for "lack of merit."  *People v. Bednarsh*, No. 286537, Order (Mich. Ct. App., Nov. 10, 2008).  Neither the trial judge's ruling on this issue, nor the rejection by the Michigan Court of Appeals of Petitioner's appeal of such, is contrary to or involves an unreasonable application of, clearly established federal law.  Furthermore, these decisions are not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

13

II.            **Right to Present a Defense**

At trial, Petitioner was prevented from presenting testimony from two proposed witnesses: (1) Randy Nelson and (2) Dr. Barbara McIntyre.  Petitioner asserts that the decision by the trial court to preclude the testimony of these particular witnesses deprived him of the constitutional right to present a defense and, therefore, violated his right to a fair trial.

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense." *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  This right is not without limits, however, and may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system"); *Couturier v. Vasbinder*, 385 Fed. Appx. 509, 516 (6th Cir., July 13, 2010) ("the right to present a complete defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions") (citation omitted).  As the Supreme Court has recognized, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006); *see also*, *Geisen*, 612 F.3d at 495; *United States v. Armstrong*, 2011 WL 3792363 at *4 (6th Cir., Aug. 26, 2011).

Accordingly, criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *Chambers v. Mississippi*,

410 U.S. 284, 302 (1973)).  The application of such rules does not abridge an accused's right to present a defense so long as they are not "arbitrary or disproportionate to the purposes they are designed to serve."  *Renico*, 606 F.3d at 870 (quoting *Scheffer*, 523 U.S. at 308).  As is well recognized, trial judges must make many evidentiary rulings during the course of a trial and "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues."  *Crane*, 476 U.S. at 689-90.

An evidentiary ruling violates a defendant's right to present a defense only where "the exclusion of evidence seriously undermined fundamental elements of the defendant's defense against the crime charged."  *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315-17).  Accordingly, whether the exclusion of the evidence in question violated the defendant's right to present a defense "depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that otherwise did not exist."  *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006).

A.      Randy Nelson

On or about May 23, 2006, J.W. "made an allegation that [Petitioner] was attempting to contact her at her bus stop, in violation of the no-contact order that had been entered" following Petitioner's arrest.  (Trial Testimony, June 15, 2006, 4).  At the time, Petitioner was "under GPS tether monitoring."  (Tr. 4).  According to Petitioner, Randy Nelson "from the GPS Tether Monitoring Service" investigated the matter and concluded that there was no evidence that Petitioner had ventured beyond his "home area" that day.  (Tr. 4).  At trial, Petitioner sought to present

testimony from Nelson regarding this incident as evidence impugning J.W.'s credibility.  (Tr. 3-6).

Michigan Rule of Evidence 608(b), which mirrors Federal Rule of Evidence 608(b), provides as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence.  They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

> The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination when examined with respect to matters which relate only to credibility.

Mich. Rule. Evid. 608(b).

The trial judge, relying on Michigan Rule of Evidence 608(b), ruled that Petitioner could not question Nelson as such would constitute an attempt to challenge J.W.'s credibility by reference to extrinsic evidence.  (Trial Transcript, June 15, 2007, 5-6).  The trial judge made clear, however, that Petitioner could explore this particular issue on cross-examination of J.W.  (Tr. 6).

Courts have long recognized that a state has a legitimate interest in "preventing minitrials on collateral issues."  *Harrington v. Jackson*, 1 Fed. Appx. 367, 371 (6th Cir., Jan. 10, 2001) (citing *Scheffer*, 523 U.S. at 314).  Thus, where a defendant is able to explore the alleged bias of a particular witness on cross-examination, the preclusion of exploring such through the introduction of extrinsic evidence concerning a collateral matter does not impair the defendant's constitutional right to present a defense. *See, e.g., Harrington*, 1 Fed. Appx. at 372 ("[w]e remain

unconvinced that unearthing bias by extrinsic evidence is 'particularly significant' or a 'fundamental element of the accused's defense,' especially in light of the fact that Petitioner had sufficient opportunity to unearth bias on cross-examination").

There is no evidence in the record that Nelson's testimony would have called into question J.W.'s allegation that on the date in question Petitioner attempted to contact her at her bus stop. Petitioner's assertion at trial was that Nelson would have testified only that there was no evidence that Petitioner had ventured beyond his "*home area*" that day. As the prosecutor asserted, given that J.W.'s bus stop was across the street from Petitioner's residence, it is entirely possible for Petitioner to have attempted to make contact with J.W. without exiting his "home area." Furthermore, as the trial judge made clear, Petitioner was permitted to explore the subject in question on cross-examination of J.W. The Court fails to discern how the exclusion of Nelson's testimony "seriously undermined" Petitioner's ability to defend against the charges in this matter. The trial judge's reasoning and analysis in excluding Nelson's testimony was completely consistent with the authority discussed above.

In sum, neither the trial judge's evidentiary ruling, nor the rejection by the Michigan Court of Appeals of Petitioner's appeal of such, is contrary to or involves an unreasonable application of, clearly established federal law. Furthermore, these decisions are not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.     Dr. Barbara McIntyre

Following the completion of the prosecution's case-in-chief, the first witness that

Petitioner sought to question was Dr. Barbara McIntyre. (Trial Transcript, June 15, 2007, 109-10). Dr. McIntyre was a psychologist with experience in the area of child sexual abuse. (Tr. 110-11). Petitioner moved to have Dr. McIntyre qualified as an expert in the field of "child sexual abuse." (Tr. 113-14). Specifically, Petitioner sought to elicit testimony from McIntyre concerning "the protocol associated with identifying bona fide episodes of child abuse." (Tr. 114). Believing that the police did not follow proper protocol with respect to their questioning of J.W., Petitioner sought to "raise the flag" that J.W.'s allegations of sexually assault were false. (Tr. 115).

The prosecutor countered Petitioner's maneuver, arguing that Petitioner had ample opportunity to cross-examine J.W., J.W.'s mother, and the various police officers concerning their conduct and whether such was consistent with the appropriate protocol. (Tr. 116). The prosecutor also argued that Petitioner was seeking to elicit from Dr. McIntyre testimony that the allegations in question are "not true," a matter which is for the jury to resolve. (Tr. 118).

Under questioning from the trial judge, outside the presence of the jury, Dr. McIntyre indicated that, in her opinion, children that make allegations of sexual abuse should be interviewed by individuals properly trained to conduct such interviews "properly so that the evidence can't be contaminated." (Tr. 120). When asked if she had any knowledge or opinion as to whether the evidence in this particular matter had been "contaminated," the doctor responded that she "would not be testifying really specifically to this case" because she had no knowledge about such. (Tr. 120). Thus, the doctor "would not offer an opinion about this case at all," but instead would simply testify that "it is possible, when children are questioned by people who are not trained to do so properly, that they can misinterpret events and often do." (Tr. 120-21).

The trial judge concluded that while Dr. McIntyre was "more than adequately trained

as an expert," her testimony "may bring an issue into this case that is not here."  (Tr. 123).  The trial

judge continued:

> She can't testify, because I just don't - I think she's been very honest
> with us and very upfront that, you know, she - she has very limited
> understanding of what exactly happened in this factual situation.
> She's talking about general protocols.  From my understanding,
> there's nothing here that you contested thus far as to the manner in
> which they conducted the interviews, the protocol that they used, the
> guidelines, the procedures that they got from Care House, the Haven,
> the prosecutor's office.
>
> That does not mean that what was stated from this witness stand is
> true or false, it just simply means that where there is nothing in the
> literature thus far that has been suggested by your proposed expert or
> by yourself that raises a question as to the pro - if you call it protocol
> and I - I accept that, because I think that's a good term, the protocols
> being followed by the Southfield Police Department and what they
> did.
>
> I think it - I think it adds - the term is not dimension, but I think it
> adds an element in this case that is more confusing than probative.

(Tr. 123-24).

When Petitioner complained that this ruling deprived him of the constitutional right

to present a defense, the trial judge responded:

> There's no question he has the right under our constitution, both the
> State of Michigan and the United States Constitution, our Bill of
> Rights and all the progeny of cases that have come since the
> Constitution to - within the perimeters of those cases and the Rules
> of Evidence and rules of procedure to insure that he has due process
> in terms of his presentation of his task before the jury.  But the Court
> also under the Constitution and under our historical memory and
> historical presence has an obligation to make sure that he or she, as
> a judicial magistrate, acts as a proper gatekeeper to insure that the
> focus is on this case and not on something that may create a cloud
> over exactly what did or did not happen.
>
> We've heard the testimony of witnesses here.  The jury can - has a

19

chance to evaluate them, you cross-examined them. I think this adds an element that I just am deciding that we're not going to have.

And you never have, you're a very fine attorney and I - I believe she - there's no question, I think she's very intelligent, she knows her field, there's no question about it, but I - from our dialogue here, I see nothing that is going to be added that will help the fact finder in their search for the truth in this case. And you know how serious I believe these charges are and how important it is for the alleged victim as well as the alleged perpetrator of that crime that the - that the truth in its human dynamics can come to the forefront. I'm very concerned about that. That's the reason I have to deny your request. Thank you.

(Tr. 124-26).

Michigan Rule of Evidence 702, which mirrors Federal Rule of Evidence 702, provides as follows:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the trial judge concluded, Dr. McIntyre's testimony would not have assisted the jury "understand the evidence or to determine a fact in issue," but instead was much more likely to simply confuse the jury. Moreover, Petitioner had the opportunity to explore on cross-examination of other witnesses the protocol or procedures employed when interviewing J.W. The trial judge's decision to not permit Dr. McIntyre to testify is consistent with well established rules of evidence and the authority discussed above. The Court is not persuaded that the exclusion of Dr. McIntyre's testimony "seriously undermined" Petitioner's ability to defend against the charges in this matter. As other courts have recognized, the United States Supreme Court has never held that a trial court's

exercise of discretion pursuant, to a well established rule of evidence, to exclude expert testimony violates a criminal defendant's right to present a defense.  *See, e.g., Cantrell v. McEwen*, 449 Fed. Appx. 698, 700 (9th Cir., Sept. 14, 2011).  To the contrary, "a rule allowing a court to exercise discretion in admitting expert testimony is the type of 'well-established rule of evidence' described approvingly by the Supreme Court."  *Id.*

In sum, neither the trial judge's evidentiary ruling, nor the rejection by the Michigan Court of Appeals of Petitioner's appeal of such, is contrary to or involves an unreasonable application of, clearly established federal law.  Furthermore, these decisions are not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Bednarsh's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file

objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

       Respectfully submitted,


Date:  May 18, 2012        /s/ Ellen S. Carmody
            ELLEN S. CARMODY
            United States Magistrate Judge